UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

USI INSURANCE SERVICES NATIONAL,
INC., formerly known as WELLS FARGO
INSURANCE SERVICES USA, INC.,

                Plaintiff,

      v.

STANLEY OGDEN, *et al.*,

                Defendants.

NO. C17-1394RSL

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT

This matter comes before the Court on "Plaintiff USI Insurance Services National, Inc.'s

Motion for Summary Judgment" (Dkt. # 70) and "Defendants' Motion for Summary Judgment"

(Dkt. # 75). Plaintiff, the 2017 purchaser of Wells Fargo's insurance services operations, sued

seven former Wells Fargo employees and their current employer, ABD Insurance and Financial

Services, Inc. The employees left Wells Fargo's employ in 2016 and 2017 to take positions with

ABD. Plaintiff alleges that the employees breached their employment agreements and fiduciary

duties and that ABD tortiously interfered with the employment contracts and/or Wells Fargo's

business expectancy.

      Summary judgment is appropriate when, viewing the facts in the light most favorable to

the nonmoving party, there is no genuine issue of material fact that would preclude the entry of

judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties, and having carefully analyzed the various contract provisions signed by the individual defendants and the record evidence regarding their actions, the Court finds as follows:

## A. Stanley Ogden

In 1994, Mr. Ogden was a shareholder in a firm called Pettit-Morry Co. On April 1st of that year, Pettit-Morry entered into a stock purchase agreement whereby Acordia, Inc., purchased all of Pettit-Morry's outstanding stock. As part of that transaction, Mr. Ogden signed a covenant not to compete. Dkt. # 1-2 at 32-38.

The provision of the agreement on which plaintiff relies for its breach of contract claims precluded Mr. Ogden from encouraging other Pettit-Morry employees from leaving the company, from making commercial use of expiration dates or other information disclosed by the employer, and from "solicit[ing] the insurance business of, or participat[ing] directing or indirectly in the handling of the insurance business of, contract[ing] with or attempt[ing] to contract with any . . . person, firm or entity which has been a client or customer of" Pettit-Morry for a period of three years after his employment with Pettit-Morry terminated. Dkt. # 1-2 at 33 (¶ 1). Mr. Ogden points out that this non-compete is triggered by the termination of his employment with "the Corporation," a defined term meaning Pettit-Morry, and that when the parties intended provisions of the agreement to apply to more entities than just Pettit-Morry, they so stated. <u>See</u> "Prohibition on Disclosure of Information, Etc." provision, Dkt. # 1-2 at 34 (¶ 5). Mr. Ogden therefore argues that the three-year window barring solicitation and the handling of insurance business for former clients was triggered by the termination of his employment with Pettit-Morry and expired in April 1997.

Mr. Ogden acknowledges that the agreement also contains a provision allowing Pettit-Morry to assign or transfer its rights under the covenant to a successor in connection with a merger, sale, or transfer of the business. Dkt. # 1-2 at 35 (¶ 8(a). He argues, however, that

(a) there is no evidence that the contract was actually assigned from Pettit-Morry to Acordia (or, for that matter, from Wells Fargo to plaintiff[1]) and (b) even if the noncompete transferred to Acordia in the merger, the covenant does not grant to a subsequent purchaser the power to further assign its rights.

USI has not provided any evidence of an assignment, instead conceding that "these contracts were never 'assigned.'" Dkt. # 109 at 4. It maintains, however, that it has the right to enforce the covenant not to compete because the covenant passed to it "through an uninterrupted line of corporate succession through a series of all-stock merger transactions." Dkt. # 109 at 4-5. Pursuant to RCW 23B.11.060(a) and (b), when a merger takes effect, the participating corporations merge into a single surviving entity into which "[t]he title to all real estate and other property owned by each corporation party to the merger is vested . . . without reversion or impairment." Thus, Pettit-Morry's property, including its contracts with its shareholders/employees and every interest in those contracts, transferred to Acordia post-merger through operation of law. Mr. Ogden has not identified any case that rejects this straightforward construction of the merger statute, either in Washington or elsewhere. The only case the Court found, <u>Acordia of Ohio, LLC v. Fishel</u>, 978 N.E.2nd 814 (Ohio 2012), was reversed on reconsideration at <u>Acordia of Ohio, LLC v. Fishel</u>, 978 N.E.2nd 823, 826 (Ohio 2012). The

---

[1] The Court has considered the Declaration of Michael Seyfried solely for the purpose of confirming the corporate transactions and relationships at issue. Whether his untimely disclosure as a witness was justified or harmless has not been determined. For purposes of the pending motions, the Court assumes that Acordia's parent company, ACO Brokerage Holdings Corp., was purchased by Wells Fargo & Co. in 2001. The insurance business continued to operate as Acordia until 2007, when Wells Fargo & Co. changed its name to Wells Fargo Insurance Services USA, Inc. Under this scenario, Acordia retained its separate existence and whatever rights it had under the non-compete through the name change.

Supreme Court of Ohio ultimately held that "[t]he merged company has the ability to enforce noncompete agreements as if the resulting company had stepped into the shoes of the absorbed company" even in the absence of any "successors or assigns" language in the noncompete agreement. See also Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990); First Fin. Bank, N.A. v. Bauknecht, 71 F. Supp.3d 819, 833 (C.D. Ill. 2014); HD Supply Facilities Maint., Ltd. v. Bymoen, 210 P.3d 183, 187 (Nev. 2009). In light of RCW 23B.11.060's broad transfer of all property postmerger, the Court finds that Acordia succeeded to Pettit-Morry's interests, rights, and liabilities under the covenant not to compete, essentially stepping into "the Corporation" role. One of the rights to which it succeeded was the right to assign or transfer the contract in connection with a merger, sale, or other disposition of the insurance business. Its subsequent merger with USI therefore effected another transfer of the contract by operation of law, with or without an express assignment of the contract.

Mr. Ogden further argues that the noncompete agreement is non-transferrable because it is a personal services contract. A basic tenet of commercial law is that all contracts are assignable unless such assignment is expressly prohibited by statute, contract, or is in contravention of public policy. Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 829 (1994); Puget Sound Nat. Bank v. State Dep't of Revenue, 123 Wn.2d 284, 288 (1994). In Washington, courts have found that contracts for personal service are an exception to the general rule in favor of assignability. Because a contract that depends on the integrity, qualifications, or skill of a particular individual for performance would be materially impaired if performed by another, such contracts are not assignable without the consent of the party to whom performance is owed. Panhandle Lumber Co. v. Mackay, 21 F.2d 916, 917 (9th Cir.

1927); <u>Fin. Servs. of Puget Sound, Inc. v. Phenneger & Morgan, Inc.</u>, 98 Wn. App. 1018, 1999 WL 1081267 at *4 (1999).

There are a number of reasons why the personal services argument is unpersuasive. First, the agreement signed in 1994 is not an employment contract and does not obligate Mr. Ogden to provide any services - personal or otherwise - to Pettit-Morry or Acordia. Rather, Mr. Ogden simply agreed to abstain from certain activities following the termination of his employment. Second, even if a covenant not to sue could be considered a promise to perform personal services, defendant provides no authority for the proposition that the judge-made equitable rule against unconsented assignment of such contracts would trump RCW 23B.11.060's automatic transfer of all property owned by the merging entities. Third, the transfer at issue here does not impinge on the interests the personal service contract exception is meant to protect. The exception applies when the parties intend to have a particular, designated person perform the contractual undertakings: those duties may not be assigned to another, performed by employees, or performed by the promisor's personal representative upon his or her death. <u>See</u> <u>MacDonald v. O'Shea</u>, 58 Wash. 169, 171-73 (1910). In order to protect the expectations of the parties, an employment contract engaging a particular person with the requisite qualifications, skills, and dedication cannot simply be assigned to a stranger for the performance of the employment duties. The assignment of the right to receive the benefits of performance, however, may in some instances occur without an adverse impact on the expectations of the performing party: that is not always the case, but Mr. Ogden has not shown that he had a specific interest in contracting with Pettit-Morry rather than its successor. Finally, in the circumstances presented here, all parties to the covenant not to compete explicitly consented to its transfer in connection with a

merger. Dkt. # 1-2 at 35 (¶ 8(a)). Thus, the parties recognized that Pettit-Morry's rights and liabilities under the contract could be assigned.

The Court finds that USI, through an unbroken series of corporate mergers, is entitled to enforce the noncompete signed in 1994. The next issue is whether Mr. Ogden breached those limitations. As noted above, Mr. Ogden promised not to encourage other employees to leave the company, not to utilize "expirations and other information disclosed" by the employer for commercial purposes, not to solicit or participate in the handling of insurance business of any client or customer of his employer, and not to contract or attempt to contract with any client or customer. Mr. Ogden acknowledged during his deposition that, starting immediately upon his hiring with ABD, he continued handling insurance business for a number of former Wells Fargo clients. Dkt. # 71-1 at 28-31. Plaintiff has therefore established a breach of the 1994 agreement regardless of whether plaintiff can prove that Mr. Ogden "encouraged" other employees to leave Wells Fargo or whether a broad prohibition on the use of "information" is enforceable.[2]

## B. Eleanor "Sam" O'Keefe

Ms. O'Keefe, like Mr. Ogden, signed a covenant not to compete as part of the merger between Pettit-Morry and Acordia. Dkt. # 1-2 at 40-46. For the reasons stated above, USI is entitled to enforce the agreement. Like Mr. Ogden, Ms. O'Keefe admitted at deposition that she continued to handle the insurance business of former Wells Fargo clients on behalf of ABD. Dkt. # 71-1 at 56-59. Plaintiff has therefore established a breach of the 1994 agreement.

---

[2] The Court finds that, given the circumstances surrounding the contract's execution and the nature of the employment relationship at issue, the promise not to do work for former clients for a three year period is reasonable.

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 7

## C. Lewis Dorrington

Mr. Dorrington began working for a predecessor of USI in 2004, at which point he signed an employment agreement. Dkt. # 1-2 at 48-50. Mr. Dorrington generally agreed that he was being fully and fairly remunerated for his services and that it would be "unfair and inequitable" for him, upon termination of his employment, "to take, as a result of his employment, accounts belonging properly to Employer." Dkt. # 1-2 at 49 (¶ F.1.). Of relevance here, he specifically agreed that he would not:

- divulge the names, addresses, or other information of the employer's customers for a period of three years following the termination of his employment; or

- call on, solicit, or take away (or attempt to call on, solicit, or take away) any of the employer's customers with whom he became acquainted during his employment for a period of three years following the termination of his employment unless those customers had conducted no business with the employer for twelve months.

Dkt. # 1-2 at 49 (¶ F.3.).[3]

_____

[3] The Court finds that the other two provisions on which USI relies for its breach of contract claim against Mr. Dorrington, F.2. and F.4., are inapplicable because they apply only "following termination of his employment by Employer." USI unconvincingly argues that "by employer" modifies "employment," not "termination" in this phrase. Where that is the intended meaning, the agreement uses the phrase "following the termination of his employment with Employer . . . ." See Dkt. # 1-2 at 49 (¶ F.3.) In the alternative, USI argues that it makes no sense to impose restrictive covenants when the employer has terminated the employment but not when an employee has taken the initiative to end the relationship. Whatever the logic or reason behind the words chosen, they are unambiguous and cannot be reformed absent a clear, cogent, and convincing showing of mutual mistake, a scrivener's error, or unilateral mistake together with inequitable conduct. See Berg v. Ting, 125 Wn.2d 544, 553-54 (1995); Davis v. Liberty Mut. Group, 814 F. Supp.2d 1111, 1117 (W.D. Wash. 2011). No such showing has been made here.

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 8

Plaintiff has not raised a genuine issue of fact regarding a breach of the restrictive covenants binding Mr. Dorrington. Paragraph F.3(b) uses active verbs, namely "call on, solicit, or take away," to describe the forbidden conduct. When read with ¶ F.4., it is clear that merely being the recipient of business transferred at the request of the customer is not prohibited by ¶ F.3. Quoting approvingly a "rough definition" formulated by the California Supreme Court, the Washington Supreme Court has stated that "[s]olicit means: To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving. By contrast, merely informing customers of one's former employer of a change in employment, without more, is not solicitation." Ed Nowogroski Ins., Inc. v. Rucker, 137 Wn.2d 427, 440 n.4 (1999) (quoting Aetna Bldg. Maint. Co. v. West, 246 P.2d 11, 15 (Cal. 1952)) (internal quotation marks and alterations omitted).[4] Mr. Dorrington did not send out change of employment notifications in this case: the evidence in the record shows that he did no more than update his LinkedIn page to reflect a change of employment. There is no indication that he used confidential client information to do so, that he initiated contact with any former clients, or that he otherwise divulged client identities to ABD (as opposed to the clients revealing themselves). Mr. Dorrington's former clients reached out to him to inquire where he had gone and/or how they could transfer their business to ABD so that he could continue servicing their accounts. No reasonable jury could, under Washington law, find that responding to such inquiries constitutes divulging, calling on, soliciting, or taking away former clients for purposes of ¶ F.3.

**D. Mary Mark**

Ms. Mark's employment agreement with USI's predecessor is similar to that of Mr.

---

[4] USI's list of cases applying non-Washington law is unpersuasive. Dkt. # 109 at 21.

Dorrington with the notable exception that the notice and liquidated damages provisions of ¶ F.2. and ¶ F.4. apply during specified periods "following termination of employment with [USI's predecessor]." Ms. Mark therefore has potential liability under not only ¶ F.3., but under ¶ F.2. and ¶ F.4 as well. Plaintiff has not, however, provided evidence that could support a finding that Ms. Mark engaged in any of the forbidden acts or that any USI account followed Ms. Mark to ABD after she resigned. The evidence submitted shows only that Ms. Mark resigned from Wells Fargo on July 29, 2016 (Dkt. # 71-1 at 184) and was hired by ABD as a Sr. Account Manager reporting to defendant John Haskell (Dkt. # 71-1 at 178).

**E. Cory Anderson**

Mr. Anderson signed an "Employment Agreement and Covenant Not to Compete" with Acordia Northwest, Inc., in October 1999. Dkt. # 27-6. The agreement set forth the terms and conditions of his employment as an account executive and imposed certain restrictions on Mr. Anderson's use of Acordia's customer lists and post-termination activities. Of relevance here, the agreement:

- required that Mr. Anderson use customer lists only as necessary in the course of his employment with Acordia and return them upon termination of his employment;

- precluded Mr. Anderson from encouraging any agent of Acordia from leaving its employ, making commercial use of information disclosed by Acordia during his employment, or soliciting or handling the insurance business of Acordia's customers for a period of three years from the termination of his employment with Acordia; and

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 10

- provided for the payment of liquidated damages if Mr. Anderson made commercial use of Acordia's information and/or handled the insurance business of Acordia's customer following the termination of the employment relationship.

Dkt. # 27-6 at ¶¶ 5-7. The parties agreed that "Employee's services [under the agreement] are personal" and his duties "may not be assigned or delegated" except that he could assign his rights to payment of amounts due and owing from the employer. Dkt. # 27-6 at ¶ 14.

Mr. Anderson argues that the contract was not assigned to USI and it therefore lacks authority to enforce the confidentiality and noncompete provisions. Although this contract contains both employment (*i.e.*, personal service) components and restrictive covenants and does not contain an explicit consent to assignment in connection with a merger, this argument nonetheless fails for the other reasons stated above with regards to Mr. Ogden's contract.

Mr. Anderson also argues that USI is barred from asserting a breach of contract claim because its predecessor, Wells Fargo, materially breached its terms when it unilaterally reduced Mr. Anderson's compensation. "A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." Jacks v. Blazer, 39 Wn.2d 277, 285 (1951) (quoting Restatement (First) of Contracts § 397 (1932)). USI's predecessor agreed to pay Mr. Anderson an initial annual salary of $50,000 and make upward semi-annual adjustments "based on 30% of the trailing twelve months' commission on existing business and 35% of the trailing twelve months' new business." Dkt. # 27-6 at ¶ 3. The salary agreement was to remain in effect for five years, at the end of which time "it will be revised upon agreement of Employer and Employee." Id. In

2010 and 2012, Wells Fargo presented, and Mr. Anderson signed, a new commission plan that reduced commissions on renewals from 30% to 25%. Dkt. # 110-1 at 2-3. These agreements specified that commissions would be paid on all revenue earned: there was no account threshold amount under which commissions were not paid. In addition, as was the case in Culbertson v. Wells Fargo Ins. Servs. USA, Inc., 191 Wn. App. 1004, 2015 WL 6696969, at *1 (2015), "[i]n exchange for signing the agreement, Wells Fargo agreed to pay an increased commission [on new revenue] for one year." At some point after 2012, Wells Fargo announced that it would no longer pay commissions on smaller accounts. Many of Mr. Anderson's clients paid total premiums that were less than the ever-increasing threshold for the payment of commissions. There is no indication in the record that this announcement was reduced to writing, accepted by Mr. Anderson, or accompanied by consideration. By the end of 2016, Wells Fargo had stopped paying any commissions on a significant number of Mr. Anderson's accounts, much less the 30% commission promised in the 1999 agreement or the 25% commission promised in 2010 and 2012.

USI argues that Wells Fargo was entitled to unilaterally change the terms of the parties' employment agreement under Washington law because (a) the 1999 promises related to salary expired by their terms in 2004 and (b) the employment relationship was at-will. Neither argument is persuasive given the facts of this case. Even if the Court were to assume that the employment agreement (or some discrete portion thereof) remained in effect for only five years and, when the parties failed to mutually agree to revised terms, expired in 2004 (Dkt. # 27-6 at ¶ 3), the parties entered into subsequent written agreements in 2010 and 2012 (Dkt. # 110-1 at 2-3). These agreements contained mutual promises, were supported by consideration, and were

signed by both parties. These new compensation promises were valid and enforceable.

With regards to the at-will employment argument, <u>Duncan v. Alaska USA Fed. Cred. U.</u>, 148 Wn. App. 52 (2008), the seminal case on modifications of the terms of at-will employment, does not support the blanket rule USI urges. The <u>Duncan</u> court determined that an employer could unilaterally modify a unilateral contract. In that case, the defendant credit union created a new lending program in Washington and developed a written summary of the compensation package for the newly-created Credit Development Officer position. The package was presented to Duncan, who accepted the new position. He was surprisingly successful in the role, and payments under the compensation package exceeded $430,000 in the first year of the program. The credit union significantly reduced the compensation package in year two. The court of appeals found that the unilateral change was enforceable because the original plan was not a bilateral agreement. There was no evidence of an exchange of reciprocal promises in the original compensation plan: rather, the employer provided information regarding how the new position would be compensated and Duncan performed the responsibilities of the position when it was offered to him. <u>Id.</u> at 74.[5] In contrast, where the employment relationship is governed by a

---

[5] "A unilateral contract consists of a promise on the part of the offeror and performance of the requisite terms by the offeree. . . . The essential distinction between a unilateral contract and a bilateral contract is the method of acceptance. In a unilateral contract . . . the offer or promise of the one party does not become binding or enforceable until there is performance by the other party, whereas, [in a bilateral contract], it is not performance which makes the contract binding, but rather the giving of a promise by one party for the promise of the other. . . . In other words, under a unilateral contract, an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed." <u>Multicare Med. Ctr. v. Dep't of Soc. and Health Servs.</u>, 114 Wn.2d 572, 583-84 (1990), superceded by statute on other grounds as stated in <u>Neah Bay Chamber of Commerce v. Dep't of Fisheries</u>, 119 Wn.2d 464, 469 (1992) (internal formatting, citations, and footnotes omitted, alteration in original). <u>See</u> <u>also</u> <u>Storti v. Univ. of Wash.</u>, 181 Wn.2d 28, 36 (2014) (identifying employee handbook provisions as an example of a unilateral contract between employers and employees).

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 13

bilateral contract, the court recognized that mutual assent to a proposed change is necessary. <u>Id.</u> at 74-75 (summarizing <u>Ebling v. Gove's Cove, Inc.</u>, 34 Wn. App. 495 (1983)).

In this case, the parties entered into a series of written contracts through 2012 in which they exchanged promises, provided consideration, and manifested their assent. Under the parlance of <u>Duncan</u> and other Washington cases, these contracts were bilateral. A bilateral contract is subject to modification arising out of the intentions of the parties and a meeting of the minds, but the modification must involve a mutual change of rights or obligations (consideration) and mutual assent. <u>Flower v. T.R.A. Indus., Inc.</u>, 127 Wn. App. 13, 27-28 (2005). One may not unilaterally modify a bilateral contract. <u>Id.</u> at 28; <u>Ebling</u>, 34 Wn. App. at 499. Because there is no evidence that Wells Fargo provided consideration for the adverse changes in the way commissions were calculated after 2012 or that Mr. Anderson assented to that changes, the modifications were invalid and unenforceable.[6] USI does not dispute that its predecessor breached its promises to pay 25% commissions on renewals with no account threshold or that this breach was material. Mr. Anderson was therefore justified in refusing to perform his obligations under the employment contracts.

**F. John Haskell**

Mr. Haskell argues that changes to his employment agreement in 2013 and 2015 lacked consideration and are therefore unenforceable. Consideration is "any act, forbearance, creation, modification or destruction of a legal relationship, or return promise given in exchange" for a contract modification. <u>King v. Riveland</u>, 125 Wn.2d 500, 505 (1994). The exchanged

---

[6] The at-will nature of Mr. Anderson's employment relationship does not, standing alone, alter this analysis. As discussed in <u>Duncan</u>, the rule that at-will contracts may be unilaterally modified applies only when the contract itself was unilateral. 148 Wn. App. at 73.

performances or promises need not be of comparative value, they just must be legally sufficient to support the obligations. Browning v. Johnson, 70 Wn.2d 145, 147 (1967). In the context of restrictive covenants, the general rule is that consideration exists for a noncompete or nonsolicitation agreement if it is negotiated when the employee is first hired: courts are willing to presume that a promise to share confidential information is exchanged for the promise not to take away co-workers or customers when the employment relationship ends. See Wood v. May, 73 Wn.2d 307, 310 (1968). A restrictive covenant introduced in the midst of employment, however, must be supported by some consideration other than simply continued employment. Absent a change in position or responsibility, the employee already has access to the employer's confidential information, and if limits are now to be placed on the employee's post-employment actions, the employer must make an exchange promise or performance. "There is no consideration when one party is to perform some additional obligation while the other party is simply to perform that which he promised in the original contract. Independent consideration may include increased wages, a promotion, a bonus, a fixed term of employment, or perhaps access to protected information . . . [and] involves new promises or obligations previously not required of the parties." Labriola v. Pollard Group, Inc., 152 Wn.2d 828, 834 (2004).

USI, as the party asserting a breach of contract claim, has the burden of showing the existence of a valid contract between the parties. Karpenski v. Am. Gen. Life Companies, LLC, 999 F. Supp.2d 1235, 1250 (W.D. Wash. 2014). USI argues that the 2015 contract is valid because, in exchange for Mr. Haskell's agreement not to solicit co-workers or customers for two years following the termination of his employment, he was reassigned to a Senior Sales Executive - Commercial Insurance position and his compensation package was changed to

include commissions. The non-solicitation provision was not, however, new in 2015, so the Court need not determine whether a demotion from Managing Director to Sales Executive and a cut in base pay satisfies the "additional obligation" requirement.

The non-solicitation provision USI seeks to enforce was introduced in January 2013 when Mr. Haskell first signed the Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions. Dkt. # 76-8 at 13-15. The agreement expands the temporal and substantive scope of the solicitation restrictions that were imposed when Mr. Haskell started working for USI's predecessor. The evidence regarding whether any of the other terms and conditions of employment were contemporaneously adjusted in exchange for the new obligations Mr. Haskell undertook is surprisingly limited. USI asserts that Mr. Haskell was promoted "from Managing Director of the regional Property & Casualty Group to Managing Director of the *entire* Northwest region," citing Mr. Haskell's deposition testimony as support. Dkt. # 109 at 14 (emphasis in original). No corporate documentation of a title change or its effects are provided. Mr. Haskell, however, confirms that he signed the 2013 agreement when he became the managing director of a region including seven or eight offices. Dkt. # 71-1 at 112. The Court will not attempt to evaluate the adequacy of the consideration provided. If, as appears to be the case, Wells Fargo promoted Mr. Haskell to a position of greater responsibility and with greater access to its confidential information in 2013, that promise is consideration for an expanded non-solicitation provision.

Mr. Haskell's 2013 and 2015 employment contracts required, in relevant part, that:

- he keep the names, addresses, contact, financial, and account information of

    Wells Fargo's client confidential; and

- he not "solicit, recruit or promote the solicitation or recruitment of" any Wells

    Fargo employee or "solicit, participate in or promote the solicitation of" any

    Wells Fargo customer for a period of two years from the termination of his

    employment with Wells Fargo.

Dkt. # 76-8 at 8. The Court finds these provisions reasonable given the nature of the insurance

industry and circumstances in which they were negotiated.

Plaintiff has not raised a genuine issue of fact regarding a breach of the confidentiality or

solicitation-of-client provisions binding Mr. Haskell. The evidence in the record shows that Mr.

Haskell, like Mr. Dorrington, simply updated LinkedIn to reflect his change of employment: he

did not send notices or any other kind of communication to the clients he had left behind at

Wells Fargo. Dkt. # 71-1 at 111. There is no indication that Mr. Haskell used client information

to update his on-line profile or otherwise used Wells Fargo's confidential client data. Nor is

there any indication that Mr. Haskell appealed to his former clients for the transfer of their

business or assisted ABD in such solicitation. No reasonable jury could find that Mr. Haskell

solicited, participated in solicitation, or promoted the solicitation of Wells Fargo customers.

Mr. Haskell's communications with Wells Fargo employees after he left the company,

however, fall within the prohibition against "promot[ing] the solicitation or recruitment of" his

former co-workers. Although there is no indication that Mr. Haskell initiated these

communications or directly asked his former co-workers to join him at ABD, he put them in

touch with individuals at ABD who could answer their questions and ultimately recruited them

to ABD. He therefore promoted the recruitment of Wells Fargo employees in violation of the

2013 and 2015 agreements.

**G. Marcia Ogden**

Ms. Ogden did not sign a confidentiality, noncompete, or non-solicitation agreement with USI or its predecessors. In the absence of any such agreement, there can be no breach.

**H. Breach of Common Law Duties**

Under Washington common law, "an employee has a duty to refrain from soliciting customers for a rival business or to act in direct competition with his or her employer's business" during the period of employment. <u>Evergreen Moneysource Mortg. Co. v. Shannon</u>, 167 Wn. App. 242, 251 (2012) (citing Restatement (Second) of Agency § 393 cmt. e (1958)). In addition, where a confidential relationship exists between the employee and the employer, the employee may "not use confidential information of his or her former employer's customers to actively solicit their business." <u>Ed Nowogroski Ins.</u>, 137 Wn.2d at 444.

Plaintiff does not allege that any of the defendants solicited Wells Fargo customers on behalf of ABD or competed against Wells Fargo while still employed by Wells Fargo. Rather, plaintiff points to evidence that Mr. and Ms. Ogden planned and coordinated their departure from Wells Fargo together[7] and that Mr. Ogden told Ms. O'Keefe that he was planning to leave, a conversation that occurred about a week before his departure from Wells Fargo. This conduct does not appear to breach any duty imposed at common law. Plaintiff has also presented evidence that Mr. Ogden disclosed the names of some of the larger accounts he was handling for Wells Fargo when he met with ABD prior to his departure from Wells Fargo.[8] If plaintiff can

---

[7] Defendants' spousal privilege arguments are rejected. Any privilege that may have shielded testimony regarding the couple's conversations has been waived.

[8] Contrary to plaintiff's bald assertion, Ms. O'Keefe's deposition testimony was that she did not disclose any client names when speaking with ABD. Dkt. # 71-1 at 53.

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 18

show that this information was confidential and that Mr. Ogden disclosed it in order to solicit business, it may succeed on its breach of duty claim. It is not, however, entitled to judgment as a matter of law based on the limited record provided.

**I. ABD Insurance and Financial Services, Inc.**

The parties generally agree that the success of plaintiff's claim against ABD for tortious interference follows the success of its breach of contract and breach of duty claims.

**J. Damages**

Plaintiff argues that proof of damages in this case "indisputably requires expert opinion testimony" and that "[l]ay opinion testimony on this subject is inadmissible." Dkt. # 70 at 23. Plaintiff misstates the law. The case it cites for this startling proposition makes clear that, while expert testimony may play a role in providing a reasonable method for calculating damages, it is not the only way to prove either the fact or the amount of damage. Alpine Indus., Inc. v. Gohl, 30 Wn. App. 750, 754-55 (1981) (noting that "[e]xpert testimony as to the amount of lost profits is admissible and may be sufficient to support a jury verdict" and acknowledging the substantial lay witness testimony admitted at trial). Alpine Industries rests heavily on Larsen v. Walton Plywood Co., 65 Wn.2d 1, 19-20 (1964), in which the state Supreme Court rejected the conclusions of plaintiff's experts as "based upon hypothesis" in favor of evidence regarding plaintiff's actual profit experience.

The expert reports provided by plaintiff are very general. Mr. Nickerson, the economist, relies almost exclusively on Mr. Tilden's opinions regarding the insurance industry and facts regarding net revenue and annual loss percentages provided by USI. Dkt. # 71-1 at 207-09. Mr. Nickerson compared the 2016-2017 revenue data with the numbers for the following year to

calculate lost profits of $13,243,185. Mr. Tilden, for his part, does not rely on Wells Fargo's actual customer retention rates (either overall or in specialty markets), Wells Fargo's retention success when a producer relocates to another agency, or Wells Fargo's actual personnel capabilities, instead relying on the "Best Practices Study Update" and his own experiences in the insurance industry. Dkt. # 71-1 at 191-94. In coming to his conclusions regarding the retention rate Wells Fargo would have had if defendants had honored their restrictive covenants, Mr. Tilden assumed that all of the defendants were barred from making contact with their former clients or otherwise notifying them of their change of employment.

Some of these assumptions are not supported by the existing record. Others are disputed. For purposes of this motion, the Court notes that the lump sum calculation of lost profits makes it impossible to allocate damages to those defendants who actually breached an enforceable restrictive covenant or duty. Even if the fact of damage arising from Mr. Ogden, Ms. O'Keefe, and Mr. Haskell's breaches is not seriously in dispute, plaintiff has not provided "reasonably convincing evidence indicating the amount of damages" associated with those breaches. Gaasland Co. v. Hyak Lumber & Millwork, Inc., 42 Wn.2d 705, 712 (1953).[9]

**K. Attorney's Fees**

Defendants make no effort to support their one-sentence request for an award of attorney's fees. Plaintiff, for its part, has not yet established damages associated with any of the breaches discussed above: its request for an award of fees is therefore premature.

---

[9] The Court has considered the Declaration of Sarah Darragh in the context of this motion, but notes that her assertion that plaintiff has received no compensation related to accounts that transferred with defendants to ABD is disputed. Whether her untimely disclosure as a witness was justified or harmless has not been determined.

For all of the foregoing reasons, the motions for summary judgment (Dkt. # 70 and # 75) are GRANTED in part and DENIED in part. As a matter of law:

- USI is entitled to enforce the 1994 agreements Mr. Ogden and Ms. O'Keefe signed and has established a breach of those agreements when Mr. Ogden and Ms. O'Keefe continued handling the insurance business of Wells Fargo clients after they began working for ABD;

- Neither Mr. Dorrington nor Ms. Mark breached the restrictive covenants they signed in 2004 and 2005, respectively;

- Although USI would otherwise be entitled to enforce the restrictive covenants Mr. Anderson signed in 1999, its predecessor materially breached the employment contract, justifying Mr. Anderson's refusal to perform and discharging his duty to do so;

- Consideration existed for the expansion of the restrictive covenants binding Mr. Haskell, and he breached the agreement when he promoted the recruitment of his former co-workers;

- Ms. Ogden is not bound by and has not breached any restrictive covenants; and

- ABD tortiously interfered with plaintiff's contractual expectations when Mr. Ogden and Ms. O'Keefe continued handling insurance business of Wells Fargo clients and when Mr. Haskell assisted ABD in recruiting his former co-workers.

The parties are encouraged to resume or restart settlement negotiations. If the parties agree that the assistance of a federal judicial officer would be of material assistance in their negotiations, they should contact the Court's judicial assistant, Teri Roberts, at 206-370-8810. If negotiations

//

fail, the parties shall notify the Court and indicate whether the previously-filed motions in limine

need to be resolved (or will be withdrawn and refiled) and when the case will be ready for trial.

        Dated this 6th day of March, 2019.

                                 _MM S Lasnik_____
                                 Robert S. Lasnik
                                 United States District Judge

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 22